IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM PICH,<br><br>          Plaintiff,<br><br>   v.<br><br>CAROLYN COLVIN, Acting<br>Commissioner of Social Security<br><br>        Defendant. | Case No.: C-12-05626 JSC<br><br>**ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Sam Pich brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration, denying him disability benefits. Now pending before the Court are Plaintiff's Motion for Summary Judgment (Dkt. No. 19) and Defendant's Cross-Motion for Summary Judgment (Dkt. No. 22). For the reasons set forth below, the Court DENIES Plaintiff's motion and GRANTS Defendant's motion.

## PROCEDURAL BACKGROUND

Plaintiff Sim Pich applied for Supplemental Security Income ("SSI") benefits pursuant Title XVI of the Social Security Act on or about December 1, 2004. *See* Administrative Record ("AR") 18.

73-75, 555.  The Social Security Administration ("SSA") denied his application initially and again on reconsideration, and he timely filed a request for a hearing.  *See* AR 402.  Upon a hearing with counsel present in March 2007, the ALJ affirmed the prior denial of Plaintiff's claim.  AR 399. Plaintiff subsequently requested review by the Appeals Council, which vacated the decision and remanded for further proceedings.  AR 420.  The remand order directed the ALJ to give further consideration to the Plaintiff's date of birth, residual functional capacity ("RFC"), treating source opinions, and to obtain supplemental evidence from a vocational expert ("VE") regarding limitations on Plaintiff's occupational base.  AR 421.

A second hearing was held on July 1, 2009.  AR 443.  On March 11, 2010, the ALJ again issued a decision finding Plaintiff not disabled.  AR 30.  The Appeals Council denied Plaintiff's request for review on August 30, 2012 and the ALJ's decision became the final decision of the Commissioner.  AR 8.  Plaintiff timely filed an appeal with this Court, seeking judicial review pursuant to 42 U.S.C. §§ 405(g).  (Dkt. No. 1.)  Both parties consented to proceed before a U.S. magistrate judge in accordance with 28 U.S.C. § 636(c).  (Dkt. Nos. 4, 11.)

## FACTUAL BACKGROUND

Plaintiff, who was 49 when he first applied for social security benefits, is a Cambodian refugee with up to three years of education and a limited understanding of English.  AR 544, 551, 599. Plaintiff worked as a farmer in Cambodia but has not worked since arriving in the United States in December of 1989.  AR 552-53.  He is married and has nine children, four of whom still live at home. AR 553-54.  He reports that his household activity is limited but that he occasionally cleans the backyard for about an hour.  AR 87.  He also drives a limited amount to doctor appointments, the grocery store, and to take his children to school.  AR 569; *see also* AR 554, 565, 567.  Plaintiff reports that he can walk three to four blocks before needing a rest and can pay attention for thirty to sixty minutes.  AR 90.  He goes outside once to twice a week for activities consisting of grocery shopping, traveling to doctor appointments and his therapy group, and caring for his children.  AR 554, 569.

Plaintiff claims disability on the basis of post-traumatic stress disorder ("PTSD"), depression, insomnia, nightmares, flashbacks, panic and anxiety attacks, inability to concentrate, forgetfulness,

inability to follow simple directions, fear of authority figures, illiteracy, and back and feet problems. AR 45, 66.

### i.  Medical Evaluations

Plaintiff has received treatment from multiple doctors, including both treating and examining source physicians.  Testimony as to Plaintiff's daily activities and his abilities was also submitted by a friend who has known Plaintiff for ten years.

### 1.  Treating Source Opinions

#### a.  Dr. Shavelson

Dr. Lonny Shavelson currently serves as Plaintiff's primary care physician and has treated Plaintiff from September 2008 through June 2009 at La Clínica in Oakland, California.  AR 522-29, 463.  Upon Plaintiff's first visit to La Clínica in September 2008 Dr. Shavelson recorded Plaintiff's prior diagnoses of depression, PTSD, and gout, but assessed Plaintiff as a "generally healthy" Cambodian male.  AR 524, 529.  In June 2009, Dr. Shavelson examined Plaintiff during a drop-in visit for shoulder and foot pain.  AR 522.  Dr. Shavelson prescribed a steroid injection in the shoulder and noted possible gout and bicipital tendonitis.  *Id.*

Upon an examination of Plaintiff's ability to do work-related activities on June 23, 2009, Dr. Shavelson opined that Plaintiff could occasionally lift and carry up to 20 pounds but never more than that amount due to gouty arthritis, and that within an eight-hour work day Plaintiff could sit for a total of eight hours, stand for two, and walk for one hour.  AR 530-31, 535.  Plaintiff could also, without interruption, sit for two hours, and stand or walk for one hour.  AR 531.  He further opined that Plaintiff could frequently reach with his right hand, occasionally operate left and right foot controls, and could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders.  AR 532-33.  Dr. Shavelson also indicated several environmental limitations due to Plaintiff's PTSD and depression but noted he could occasionally operate a motor vehicle.  AR 534.  Dr. Shalveson opined that Plaintiff is not impaired to perform activities such as shopping, traveling without a companion, ambulating, walking a block at a reasonable pace, and he listed no work-related activities that are affected by Plaintiff's impairments.  AR 535.  He further found that Plaintiff's ability to understand, remember, carry out, and make judgments on simple instructions is moderate,

*i.e.*, there is more than a slight limitation in this area but the individual is still able to function satisfactorily.  AR 536.  Plaintiff's ability to understand, remember, carry out, and make judgments on complex instructions was also moderate.  AR 536.  Plaintiff's ability to interact appropriately with the public, supervisors, co-workers, and to respond appropriately to usual work situations and changes in a routine work setting were similarly assessed as moderate due to Plaintiff's PTSD and depression. AR 537.

### b.  Dr. Ma

Dr. Davera Ma treated Plaintiff at the Asian Health Center in February of 2007 and diagnosed Plaintiff with PTSD, Major Depression, gout, and tendinitis.  AR 357-70.  Dr. Ma opined that Plaintiff's current level of functioning was impacted by these diagnoses and amplified the symptoms of his back and foot pain, making it difficult for him to stand and walk for a significant period of time. AR 357-58.

### c.  Drs. Gracer and Afary

Drs. James Gracer, M.D., psychiatrist, and Mona Afary, Ph.D., a psychologist, each based out of the Jewish Family and Children's Services of the East Bay Refugee/Immigration Program in Oakland, treated Plaintiff for mental health issues beginning in November of 2002 and continuing through May 2009.  AR 241, 285, 458.  During this time, each diagnosed Plaintiff with PTSD and Major Depression.  AR 251.  Dr. Gracer noted that Plaintiff's motor activity was agitated, his speech was pressured, and that his behavior was irritable but cooperative.  AR 251.  On February 23, 2006, Dr. Gracer found Plaintiff's concentration and memory to be moderately impaired, and opined that his intelligence was above average.  AR 252.  Dr. Gracer described Plaintiff's mood as depressed, and noted that he suffered from financial problems and slept 2-3 hours per night without medication or 4-5 hours per night with medication.  AR 255.

In February 2006, Dr. Afary opined that Plaintiff's ability to understand, remember, and carry out complex instructions, complete a normal workday, or respond to changes in a work setting was poor, but that his ability to understand, remember, carry out simple instructions, maintain concentration, perform activities within a schedule and maintain regular attendance was fair.  AR 254. Dr. Afary also opined that Plaintiff's ability to interact with the public, coworkers, or supervisors was

poor, as was his ability to adapt to changes in the work place, though he was deemed capable of reacting appropriately to and remaining aware of normal hazards.  AR 254, 256-57.

On May 29, 2008, Dr. Gracer reported that Plaintiff's ability to understand, remember, and carry out simple instructions was fair, but his ability to understand, remember, and carry out complex instructions, maintain concentration, perform activities within a schedule, complete a normal workday, or respond to changes in a work setting was poor.  AR 510.  His treatment notes reported that Patient is "doing poorly right now—he has severe gout and worsened depression."  AR 509.  On that same day, Dr. Afray reported the same in regards to Plaintiff's ability to carry out simple versus complex instructions, but differed with Dr. Gracer in concluding that Plaintiff had a "fair" level of sustained concentration and task persistence in order to carry out instructions, attend and concentrate, and work without supervision.  AR 511.  Dr. Afray also found that Plaintiff's ability to interact with the public, coworkers, and supervisors was poor.  AR 512.  His ability to interact with changes in the workplace was also poor.

In April of 2009 she and Dr. Gracer recorded that Plaintiff is not able to do work-related physical and mental activities and marked his abilities as poor for everything except carrying out simple instructions, which was reported to be fair.  AR 462.

## 2.  Examining Opinions

### a.  Dr. Miller

Drs. Afary and Gracer referred Plaintiff to Dr. Laurence Miller, Ph.D., in December 2006 for psychological testing in order to "clarify Mr. Pich's diagnoses and attempt to answer the question of whether he is suffering from . . . PTSD and/or Major Depression."  AR 122, 375.  Dr. Miller administered the Harvard Trauma Questionnaire, the Posttraumatic Diagnostic Scale (PDS), and the Burns Depression Inventory and Anxiety Inventory.  AR 375.  After two sessions with Plaintiff in June and July of 2006, Dr. Miller reported that Plaintiff "alternated between states of confusion and alertness" during the interview and that he appeared "psychologically numb and removed."  AR 375, 378.  Dr. Miller opined that Plaintiff's mood was predominantly depressed, pessimistic, and confused.  AR 378.

Based on these examinations and Plaintiff's self-reports, Dr. Miller assessed Plaintiff as extremely anxious, suffering from great pain, and that he showed intense difficulty concentrating. AR 380. Plaintiff's responses on the Depression Checklist placed him in the intense range of depression. Dr. Miller diagnosed Plaintiff with PTSD, Major Depression, and opined he was likely suffering from a Panic Disorder. AR 381. He also recorded that Plaintiff's "vacillation between states of anxiety and hopelessness leaves Mr. Pich psychologically exhausted and at grave risk for harming himself." AR 382.

### b. Dr. Young

Dr. April Young, Ph.D., conducted a psychological evaluation of Plaintiff on March 7, 2005 at the request of the California Department of Social Services to assist with determining his disability status. AR 205. Dr. Young conducted a Complete Psychological Evaluation, a Test of Nonverbal Intelligence-III (TONI-III), and a Bender Visual Motor Gestalt Test-II (Bender II). Upon a mental status exam, Dr. Young found Plaintiff to be alert, that he displayed adequate attention and concentration for conversation, his memory was grossly intact for immediate, recent, and remote events, his judgment was fair, and that there was no evidence of hallucinations, delusions, or other symptoms suggestive of a thought disorder during the evaluation. AR 207.

Plaintiff's performance on the TONI-III fell within the "Very Poor" range and showed impaired cognitive functioning and visual-motor skills within the low range. *Id.* During the examination, Plaintiff reported sleeping one to two hours per night, experiencing nightmares one to three times per week, that he had been tortured and traumatized under the Khmer Rouge in 1976 and 1977 and had witnessed his brother tied to a tree for two weeks without food and water. *Id.* He reported that he feels tired, irritable, fearful of leaving his house alone, and that his concentration is affected by stress. AR 205-07. Dr. Young noted that Plaintiff requires reminders for his appointments and to take his medications, but that the medications have helped Plaintiff to sleep and feel less depressed. AR 207. Plaintiff also reported experiencing auditory hallucinations on a frequent basis: he hears yelling and shouting, someone telling him to "call for help," and he hears someone knock on the door when no one is there. He further reported experiencing flashbacks of his trauma, heart palpitations, and shortness of breath. *Id.*

Dr. Young ultimately diagnosed Plaintiff with PTSD and Major Depressive Disorder. AR 208. Based upon the clinical interview, mental status examination, and test scores, Dr. Young concluded Plaintiff's ability to relate to others, including co-workers, supervisors, and the general public, is impaired. His ability to understand and follow instructions is unimpaired, but his ability to perform detailed or complex tasks is impaired. *Id.* Finally, Dr. Young opined that Plaintiff is limited in his ability to manage his supplementary funds in his best interest. *Id.*

### c. Dr. Pon

Dr. Calvin Pon evaluated Plaintiff on March 8, 2005. AR 210. Dr. Pon's diagnostic impression revealed chronic low back pain, possible lumbar disk disease, chronic bilateral foot pain, but no joint swelling. AR 210-12. Dr. Pon recorded no restrictions on standing, walking, sitting, climbing stairs, ladders, or crawling. AR 212. Despite Plaintiff's complaints regarding foot pain, Dr. Pon concluded that Plaintiff could perform bilateral pushing and leg/foot controls on a frequent basis, and he could lift and carry up to twenty-five pounds frequently and up to fifty pounds occasionally. There were no limitations on Plaintiff's ability to perform reaching bilaterally, or to perform gross and fine manipulative tasks with both hands. *Id.* Stooping, crouching, kneeling, and squatting should be limited to occasionally. *Id.*

### 3. Savee Praloung

A family friend, Savee Pralourng, testified that she has known Plaintiff for ten years and sees him once a week. AR 769. She testified that Plaintiff drives his children to and from school, and that Plaintiff used to be "a lot stronger" and "was able to work in the back yard without getting tired or hav[ing] any pain, but now it is difficult for him because of pain in his legs." AR 76-77. She also noted that Plaintiff has difficulty sleeping, that he needs reminders to take medications, and that "once [in] a while he helps with the yard." AR 78.

### ii. Hearings

Plaintiff's first hearing before the ALJ took place on March 1, 2007. AR 542. After the ALJ's decision was remanded by the Appeals Council, a second hearing was convened on May 20, 2009, though because of an administrative error in scheduling an interpreter, the actual hearing did not take place until July 1, 2009. *See* AR 581-85.

1    At the first hearing before the ALJ in 2007, Plaintiff testified that he drives, but that his

2 driving is limited due to fear from a prior accident and back pain that results in difficulty sitting for

3 long periods of time. AR 569. He testified to using his car for doctor appointments, grocery

4 shopping, and transporting his children to and from school. AR 569. Plaintiff further testified that he

5 sometimes takes these trips outside of the house by himself. AR 572. He stated, though, that when he

6 is by himself he is "frightened because I got suffering from post traumatic stress and anxiety when I

7 saw something aggressive or a little anxious." *Id.* He also testified that while he can sleep with

8 medication, he has nightmares about his family tragedy one to two times per week. AR 569-70.

9    During this first hearing, Joel Greenberg served as the Vocational Expert ("VE") and provided

10 testimony as to the availability of jobs in the national economy for someone with an inability to

11 communicate in English, and a medium exertional RFC with no public contact. AR 573-574. The

12 VE testified that locally (in the Oakland/Fremont/East Bay areas) there existed 5,930 medium,

13 unskilled jobs such as that of a hand packager, 2,500 jobs as an order picker/puller, and 1,700 as a

14 small products assembler completing light, unskilled work. AR 574-75. At the national level, the VE

15 testified that there were 840,000 jobs available for a hand packager, 528,000 as an order picker/puller,

16 and 299,000 as a products assembler. *Id.* Taking into account a sit/stand option, the VE testified that

17 such an option would erode the market by approximately 50 percent for small product assembly, 75

18 percent for the hand packager, and that it would eliminate the order picker. AR 576-77. He also

19 testified that taking into account the inability to complete a normal workday or workweek without

20 interruptions from psychologically based symptoms would keep the person from being employed, and

21 that the inability to relate to others, including coworkers, supervisors, and the general public in an

22 appropriate manner would "have a very negative impact on his ability to maintain that job over time."

23 AR 579.

24    At the July 2009 hearing, Plaintiff testified once more and stated that his mental and physical

25 health had worsened since the first hearing. AR 597. Specifically, Plaintiff testified that his feet hurt

26 and he could "barely" walk. Id. He also stated that he "cannot sleep, and [he] ha[s] a lot of

27 nightmare[s]." *Id.* Plaintiff testified that he can stand for 30 to 60 minutes, walk 40 to 50 meters, lift

28

8

no weights, and cannot use his right hand.  Id.  Plaintiff further testified that if needs to go to an appointment, he asks his children to bring him there.

Jeff Malmuth served as the VE and testified that assuming Plaintiff's age, education, lack of recent work experience, and a capacity for light work with no public contact, that there are approximately 9,650 jobs in the local economy, and approximately 950,000 nationally.  AR 581, 601-04.  AR 605.  He testified that these jobs did not require literacy; rather, they "are unskilled positions" requiring "very little" understanding.  AR 606-07.  He did find, however, that the job title of housekeeping cleaner would require some minimal communication with the public, and thus these jobs, 3,700 locally and 243,000 nationally, would be eroded at a 25 percent level to account for Plaintiff's language barriers.  AR 605.

### iii.    The ALJ's Findings

An ALJ conducts a five-step sequential inquiry to determine whether a claimant is entitled to benefits.  20 C.F.R. § 416.920.  At the first step, the ALJ considers whether the claimant is currently engaged in substantial gainful activity (*i.e.*, if the plaintiff is currently working); if the claimant is not, the second step asks if the claimant has a severe impairment or combination of impairments (*i.e.*, an impairment that has a significant effect on the claimant's ability to function); if the claimant has a severe impairment, the third step asks if the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the "Listings"); if the claimant does not have such a condition, the fourth step assesses the claimant's RFC and determines whether the claimant is still capable of performing past relevant work.  *Id.* §§ 404.1520(b)-404.1520(f).  An ALJ will often consult the Dictionary of Occupational Titles ("DOT") for "supplementary and corroborative information" on the physical and mental demands of a claimant's former work.  Social Security Ruling ("SSR") 82-62, 1982 WL 31386, at *3.

If the claimant is not capable of performing his past relevant work, the fifth and final step asks whether the claimant can perform any other existing work in the national economy based on his RFC, age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920; *Stout v. Commissioner*, 454 F.3d 1050, 1052 (9th Cir. 2006). The burden shifts to the defendant to demonstrate the existence of a significant number of jobs in the national economy that could be performed by the claimant.

1   *Tackett*, 180 F.3d at 1098. This burden is satisfied through testimony from a VE or reference to grids

2   that present "a short-hand method for determining the availability and numbers of suitable jobs for a

3   claimant." *Id.* at 1101.

4       Here, taking into consideration the testimony and evidence, the ALJ followed the five-step

5   sequential evaluation process. At step one, the ALJ noted that Plaintiff has not worked since coming

6   to the United States and therefore a disability finding is not precluded by work activity. AR 403. The

7   heading for the ALJ's step two discussion reads: "The claimant has the following severe impairments:

8   gout; arthritis; and a depressive disorder." AR 21. He then, however, proceeded to list all of

9   Plaintiff's medically determinable impairments and appears to find them all severe:

> The claimant has alleged disability on the basis of post-traumatic stress disorder and
> depression with insomnia; nightmares; flashbacks; depression; hypervigilance;
> panic/anxiety attacks; difficulty following instructions; and an inability to concentrate.
> He reported a history of forced labor, being subjected to starvation and various forms
> of torture, and witnessing the murders of family members and others under the Khmer
> Rouge in the 1970's. The claimant further reported that he has difficulty functioning
> on a day-to-day basis and is unable to care for anyone.
>
> . . .
>
> Based on the evidence of record, I find that the above cited medically determinable
> impairments significantly limit the claimant's ability to perform basic work activities,
> as set forth at 20 CFR 416.921, and must be deemed "severe."

18  AR 21.

19      At step three, the ALJ found that these impairments or combination of impairments did not

20  meet or medically equal one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1.

21  AR 21. The ALJ noted that the PTSD diagnoses did not impede Plaintiff's performance of household

22  chores or care for his children, and was thus deemed "no more than a mild restriction of activities of

23  daily living and moderate difficulties in maintaining social functioning." *Id.* Accordingly, the ALJ

24  concluded that Plaintiff's PTSD-related impairments do not rise to the level of a listing level mental

25  impairment. *Id.*[1]

26

27  ---
    [1] The ALJ also did not find support in Plaintiff's medical records for a finding of joint inflammation
    or deformity that would result in an inability to ambulate effectively or to perform fine and gross
28  movements effectively, which would be necessary to satisfy the criteria for listing level inflammatory
    arthritis. *Id.* However, because Plaintiff does not contest the ALJ's finding regarding Plaintiff's foot

The ALJ concluded that psychological evaluations and testing performed from 2004 to 2006 indicated that Plaintiff had "at least a fair ability to maintain concentration and attendance." *Id.* The ALJ also indicated that Dr. Young's March 2005 report was inconsistent as to Plaintiff's moderate to severe impairment in his ability to perform simple and repetitive tasks. AR 22.

The ALJ expressed skepticism over the opinions of Drs. Afary and Gracer's opinions because they were "based solely on the claimant's own reports of symptoms and limitations" without any corroboration. AR 22. The ALJ also stated that Dr. Gracer's most recent evaluation, a May 29, 2008 report, "indicate[d] to [him] that Dr. Gracer misunderstands or mischaracterizes the actual medical record." *Id.* Specifically, the ALJ took issue with Dr. Gracer's statement that "Pt is doing poorly right now—he has severe gout and worsened depression," which the ALJ stated contradicts Plaintiff's primary care physician, Dr. Shavelson, who less than two weeks later would conclude that Plaintiff simply had "possible gout." *Id.*

At step four, the ALJ determined that Plaintiff has the RFC to perform medium work with no public interaction. AR 23. The ALJ noted Plaintiff's "largely unremarkable" examination at Asian Health Services and Dr. Pon's conclusion that Plaintiff "could sit or stand without limitation, lift 25 lbs. and occasionally 50 lbs; and frequently do occasional stooping, crouching, kneeling and squatting." AR 23. The ALJ also took note of Dr. Ma's February 2007 finding that Plaintiff suffered from back and lower extremity pain, and that his PTSD and depression "most likely amplify these symptoms." *Id.*

The ALJ stated that while he would "accord some deference to Dr. Afary's and Dr. Gracer's finding that the claimant would have difficulty interacting with the public and their findings that the claimant has fair abilities to understand, remember and carry out simple instructions and maintain attention and concentration," he accorded no weight to their January 2005 finding that Plaintiff "has a poor ability to respond appropriately to changes in a work setting" and their February 2006 finding that he has a poor ability to adapt to changes in the workplace. AR 25. The ALJ deemed these conclusions inconsistent with further findings, "based on [Dr. Afary's and Dr. Gracer's] long-term

pains and gout diagnoses, medical observations relating to such impairments will not be discussed further.

treatment relationships with the [Plaintiff]" where they had found he has "a fair ability to perform activities within a schedule; maintain regular attendance; complete a normal work day or work week without interruption from psychologically-based symptoms; and maintain concentration, persistence, and pace, and that he has a good awareness of normal hazards and a good ability to react appropriately to them." *Id.* The ALJ also "carefully considered" Dr. Ma's opinion but did not find it persuasive. AR 25-26. He "decline[d] to credit the mental health assessments of Dr. Shavelson, as they are beyond his area of expertise and are unsupported by his own treatment records." AR 26.

Ultimately, looking at the "medical record as a whole," the ALJ concluded that Plaintiff is able to perform medium work requiring no interaction with the public. The ALJ noted that "[c]ertainly, some refugees from Cambodia and other countries suffered severe personal trauma in various forms. Equally certain, however, is that not all refugees from war-torn countries suffered the kinds of personal trauma alleged here. Nothing . . . establishes that *this particular claimant* suffered personal trauma, has an impairment, that is severe, or that it precludes him from working." *Id.*

Regarding Plaintiff's credibility, the ALJ noted "significant symptom embellishment" during Dr. Young's and Dr. Miller's examinations; in particular, Plaintiff's statement to Dr. Young in March 2005 that he had experienced "frequent auditory hallucinations" for more than a year, yet he had not reported such symptoms at any other time previously or since, including on visits to Dr. Afary or Dr. Gracer, who he has been seeing since 2001. AR 27. The ALJ further noted that Plaintiff had specifically denied such hallucinations in a December 2005 examination with Dr. Miller. *Id.* The ALJ also emphasized Plaintiff's "intricate" recounting of traumatic experiences in Cambodia during Dr. Miller's examination that had not been previously reported, and considered this detailed recounting to be inconsistent with an "extremely compromised memory." *Id.* He also found Plaintiff's report to Dr. Young in 2005 that he does not drive because of his concern for heart issues to be inconsistent with frequent reports of driving himself to doctor's appointments and his children to and from school. *Id.* The ALJ additionally relied on conflicting evidence regarding Plaintiff's vehicle ownership to support a finding that Plaintiff lacks credibility. He opined that Plaintiff's "conflicting statements regarding his ownership of various motor vehicles and the transfer of ownership of title to

1   the 2000 Toyota shortly after the Cooperative Disability Investigations Unit's report was issued

2   substantially undermine his credibility."  AR 28.

3        He also considered Plaintiff's daily activities to undermine his credibility: "[w]hile asserting

4   that he cannot concentrate enough to work, the claimant apparently feels comfortable enough to drive

5   his children to and from school on a daily basis."  *Id.*  Plaintiff is also capable of cleaning his

6   backyard, shopping, and managing money.  *Id.*

7        Finally, the ALJ took Plaintiff's age, education, work experience, and RFC into consideration

8   and concluded that Plaintiff can perform jobs that exist in significant numbers in the national

9   economy.  AR 29.  As such, the ALJ found Plaintiff not disabled as defined in the Social Security Act.

10  AR 30.

11                          **STANDARD OF REVIEW**

12       Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's

13  decision to deny benefits.  A district court may overturn a decision to deny benefits only if it is not

14  supported by substantial evidence or if the decision is based on legal error.  *See Andrews v. Shalala*,

15  53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The

16  Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a

17  preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support

18  a conclusion."  *Andrews*, 53 F.3d at 1039.  Determinations of credibility, resolution of conflicts in

19  medical testimony and all other ambiguities are to be resolved by the ALJ.  *See id.*; *Magallenes*, 881

20  F.2d at 750.  "The ALJ is entitled to draw inferences logically flowing from the evidence."  *Gallant v.*

21  *Heckler*, 753 F.2d 1450 (9th Cir. 1984) (citations omitted); *see Batson v. Commissioner*, 359 F.3d

22  1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational

23  interpretation, we must defer to the ALJ's conclusion.").  "The court may not engage in second-

24  guessing."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).  "It is immaterial that the

25  evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's

26  determination as to a factual matter will stand if supported by substantial evidence because it is the

27  Commissioner's job, not the Court's, to resolve conflicts in the evidence."  *Bertrand v. Astrue*, 2009

28  WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

                                    13

**DISABILITY STANDARD**

A claimant will be considered "disabled" under the SSA if he meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, he must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that he is unable to do his previous work and cannot, based on his age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

**DISCUSSION**

Plaintiff raises four issues on appeal to this Court: (1) whether the ALJ erred by failing to include diagnoses of Major Depressive Disorder and PTSD as severe impairments at step two; (2) whether clear and convincing reasons were given to support the rejection of Plaintiff's treating and examining medical sources; (3) whether the ALJ properly evaluated Plaintiff's credibility; and (4) whether the RFC determination and vocational expert testimony were supported by substantial evidence.

**A.      The ALJ's Step-Two Determination**

Step two serves as a "de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ is to determine whether the claimant has a "medically severe impairment or combination of impairments." *Id.* Plaintiff contends that the ALJ erred by failing to include PTSD and Major Depression or Major Depressive Disorder as severe impairments at this stage of the disability analysis.

Regarding depression, the ALJ's heading for his step two discussion specifically lists "a depressive disorder" as a severe impairment. AR 21. Plaintiff argues that the ALJ's naming his diagnosis "a depressive disorder," rather than the more specific "Major Depressive Disorder," was error. Plaintiff is incorrect. The ALJ's reference to "a depressive disorder" simply refers to one of Plaintiff's alleged bases for disability—depression, specifically, Major Depressive Disorder. Further, Plaintiff's Major Depressive Disorder was Plaintiff's only depression diagnoses alleged, thus there

14

1  can be no confusion as to what the ALJ was referring to when he listed "a depressive disorder."

2  Contrary to Plaintiff's argument, nothing in the record supports the contention that the ALJ was

3  "substitut[ing] his own medical opinion" for Plaintiff's alleged diagnosis. (Dkt. No. 23 at 2.)

4  Plaintiff cites no case for the proposition that an ALJ must refer to a particular depression diagnosis

5  by name, especially where there is no ambiguity as to which depression diagnosis the ALJ is

6  referring.

7       Moreover, even if the ALJ failed to include the Major Depressive Disorder as a severe

8  impairment at step two, that error was harmless because he considered the limitation later in the

9  sequential evaluation process. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). As discussed

10  in the sections below, the ALJ explicitly considered Plaintiff's depression diagnosis at later steps in

11  the analysis, ultimately concluding that a disability finding based on Plaintiff's depression was not

12  supported by the medical record. *See, e.g.*, AR 21 ("Although the claimant has been diagnosed with

13  depression and post-traumatic stress disorder (PTSD), the evidence before me does not describe that

14  degree of functional limitation necessary to establish a Listing level mental impairment."). Thus, any

15  error was harmless. *See Lewis*, 498 F.3d at 911.

16       While Defendant appears to agree that the ALJ did not list PTSD as a severe limitation at

17  step two (*see* Dkt. No. 22 at 10 ("[T]he ALJ did not include PTSD in his findings of severe

18  impairments . . . .")),[2] any error was harmless under *Lewis*. As with Plaintiff's depression, Plaintiff's

19  PTSD diagnosis is discussed throughout the remainder of the decision. *See, e.g.*, AR 21 ("Although

20  the claimant has been diagnosed with depression and post-traumatic stress disorder (PTSD), the

21  evidence before me does not describe that degree of functional limitation necessary to establish a

22  Listing level mental impairment.")

23

24

25

26  _____

[2]  The Court notes that the question of whether the ALJ listed PTSD as a severe impairment at least
27  appears open to interpretation. Although PTSD was not cited in the heading for step two, the ALJ
listed PTSD as a basis for Plaintiff's alleged disability, discussed Plaintiff's reported PTSD
28  symptoms, and then concluded that the "above cited medically determinable impairments" were
severe. AR 21.

**B.     Weight Given to the Opinions of Drs. Gracer, Afary, Miller, and Young**

Plaintiff next contends that the ALJ improperly rejected some of the treating and examining mental health medical sources.  Social Security regulations provide that treating sources be given controlling weight when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  "The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted).

If the treating source is not contradicted by substantial evidence, clear and convincing reasons must be given for rejecting the treating source opinion.  *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  The ALJ must cite specific and legitimate reasons for rejecting the opinion of a treating physician in favor of a conflicting opinion by an examining physician.  *Id.* at 957.  The standard is similar for rejecting examining source opinions.  *See Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995) ("[T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." (citations and internal quotation marks omitted)).

If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given.  *See* 20 C.F.R. § 404.1527(c); *see also Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007).   Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician.  20 C.F.R. § 404.1527(c)(2)(i)-(ii).  Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther

factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(c)(3)-(6).

### 1. Drs. Gracer and Afary

The ALJ's decision to discredit Dr. Gracer's and Dr. Afray's opinion that Plaintiff has a "poor" ability to adapt to changes in a workplace setting was supported by a clear and convincing reason. While the ALJ gave "some deference" to Dr. Afray's and Dr. Gracer's finding that the claimant would, among other things, have difficulty interacting with the public,[3] the ALJ accorded no weight to Dr. Afary's and Dr. Gracer's finding that Plaintiff has a poor ability to "respond appropriately to changes in a work setting" because, at the same time, they made what the ALJ deemed a contradictory finding that the claimant "has a fair ability to perform activities within a schedule; maintain regular attendance; complete a normal work day or work week without interruption . . . and maintain concentration, persistence, and pace, and that he has a good awareness of normal hazards and a good ability to react appropriately to them." AR 25. That Plaintiff could have a fair ability in regards to the many activities just listed, yet a poor ability in regards to the closely-related activity of responding appropriately to changes at work, creates an inconsistency as far as Plaintiff's work-related functioning. This identified inconsistency is not explained by either Dr. Afray or Dr. Gracer. Nor does Plaintiff identify any medical evidence in the record that would explain the inconsistency or otherwise support the doctors' conclusion.

The Court emphasizes that the ALJ's rejection of Dr. Gracer's and Dr. Afray's opinion was narrow—it was limited to their finding that Plaintiff has a poor ability to respond to changes in the workplace. Other findings, such as the finding that Plaintiff has a poor ability to interact with coworkers and supervisors, were accepted, albeit given reduced weight, as discussed below. Thus, when Plaintiff baldly asserts that the opinions, generally, are "consistent," it is unresponsive to the ALJ's reason for rejecting the finding that Plaintiff has a poor ability to adapt to changes in the workplace.

---

[3] The ALJ's RFC determination specifically included the limitation that Plaintiff could have no interaction with the public.

To the extent the ALJ gave reduced weight to Dr. Gracer's and Dr. Afray's updated progress notes and opinions since the first hearing,[4] the ALJ adequately explained his reasons for doing so. The ALJ stated that Dr. Gracer's and Dr. Afray's progress notes and opinions from March 5, 2007 to May 14, 2009 "did not support a Listing level impairment" since the progress notes and opinions were "based solely on the claimant's own reports of symptoms and limitations, without any corroboration and without any attempt, apparently, to resolve any of the numerous inconsistencies addressed herein." AR 22. In other words, the ALJ gave their opinions reduced weight because he found inadequate the "nature and extent of the treatment relationship" between Plaintiff and Drs. Gracer and Afray, 20 C.F.R. § 404.1527(c)(2)(i)-(ii), as well as the amount of relevant evidence that supports the opinion and the quality of the explanation provided, *id.* § 404.1527(c)(3). The ALJ's determination is supported by substantial evidence. *See Andrews*, 53 F.3d at 1039. Dr. Afray's updated progress notes are conclusory, merely stating that Plaintiff is "terribly depressed" and that his condition is getting "worse." AR 474. The notes also simply repeat Plaintiff's concerns and fears, and they do not connect Plaintiff's depression and/or PTSD to the stated work limitations in Dr. Afray's May 29, 2008 Medical Source Statement. *See AR 511-12.* That Plaintiff is depressed and suffering from PTSD does not provide a quality explanation as to why Plaintiff's work abilities are so restricted. Dr. Gracer's May 29, 2008 evaluation was also properly given reduced weight since, as the ALJ determined, the opinion appears based on Plaintiff's complaints, without any explanation of what additional evidence supports the conclusion that Plaintiff's depression has "worsened." *See AR 507-512.* As the ALJ pointed out, Dr. Gracer's May 29 opinion appears to exaggerate the medical record as Dr. Gracer states that Plaintiff has "severe" gout, AR 509, but Plaintiff's primary care physician, Dr. Shavelson, less than two weeks later concluded that Plaintiff simply had "possible gout," AR 522. The ALJ's observation justifies his reduction of the weight afforded to the opinion since it is not consistent with the record as a whole. *See 20 C.F.R. § 404.1527(c)(4).*

Plaintiff fails to identify any specific evidence in the relevant treatment notes and check-off evaluation forms that contradict the ALJ's determination that Dr. Gracer's and Dr. Afray's opinions

---

[4] Although the ALJ's criticism of Dr. Gracer's and Dr. Afray's updated progress notes and opinions were made in the context of whether Plaintiff's severe impairments met the listing level requirements, the parties appear to agree that the ALJ's conclusion carried over the ALJ's RFC determination.

are not well supported; rather, Plaintiff baldly states that both doctors did not rely exclusively on check-off forms, and that the record "contain[s] lengthy records documenting years of observation and treatment notes." (Dkt. No. 23 at 6.) This conclusory assertion is unhelpful in determining whether the ALJ erred in giving reduced weight to Dr. Gracer's and Dr. Afray's opinions. A long treatment history and lengthy records of Plaintiff's therapy sessions are not dispositive of whether the doctors' ultimate opinions as to work limitations are well supported.

The Court's conclusion as to the ALJ's assessment of Dr. Gracer's and Dr. Afray's work limitation opinions is valid even if the ALJ improperly reasoned that such opinions could be rejected or given less weight because they were based on Plaintiff's self-reports, which the ALJ concluded were less than credible. "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199–1200 (9th Cir. 2008). However, where the ALJ provides other reasons for rejecting or discounting a doctor's opinion that are clear and convincing, the ALJ's faulty reason constitutes harmless error. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[T]he relevant inquiry in this context is . . . whether the ALJ's decision remains legally valid, despite such error."). Here, while Dr. Gracer and Dr. Afray did not discredit Plaintiff's complaints nor is it apparent that they did not attempt to support their opinions with some observation, the ALJ's decision on this point is harmless error since, for the reasons discussed above, the ultimate decision to reject and/or discount their opinions was based on other clear and convincing reasons and supported by the record as a whole.

As stated above, the ALJ's determination that the observation and treatment notes do not adequately explain the doctors' opinions as to Plaintiff's work limitations is clear and convincing and based on substantial evidence and therefore entitled to deference.

2. **Dr. Young**

The ALJ "accord[ed] no weight to Dr. Young's finding that the claimant has a moderate to severe impairment in maintaining concentration, persistence, or pace." AR 25. The ALJ identified unexplained internal inconsistencies in Dr. Young's one-time physiological examination of Plaintiff.

For example, although Dr. Young "concluded in March 2005 that the [Plaintiff's] ability to maintain the appropriate level of concentration, persistence, and pace necessary to perform simple repetitive tasks was moderately to severely impaired, she also noted that he exhibited adequate attention and concentration during [the] mental status examination." AR 22. The ALJ also appears to question the conclusions drawn by Dr. Young:

> Dr. Young noted some impairments of delayed recall and some evidence of impaired cognitive functioning . . . but noted no slowing, normal speech, linear and unimpaired thought processes, and grossly intact memory and adequate attention and concentration. Nonetheless, Dr. Young concluded that the claimant's ability to relate to coworkers, supervisors, and the general public was impaired, and that he had a moderate to severe impairment in his ability to maintain concentration, persistence or pace.

AR 24. The ALJ additionally concluded that Plaintiff embellished his symptoms when he reported to Dr. Young that he had been experiencing auditory hallucinations for over a year on a frequent basis, yet at no other point in his long treatment record is there any indication that he reported such hallucinations before or any time since. *See* AR 24, 207.

As an initial matter, the Court notes the limited nature of the ALJ's rejection of Dr. Young's opinion—it is simply Dr. Young's conclusion that Plaintiff "has a moderate to severe impairment in maintaining concentration, persistence, or pace." AR 25. Indeed, the ALJ's own conclusion on this limitation is quite similar to Dr. Young's: "I thus find that the record as a whole is consistent with mild to moderate difficulties in maintaining concentration, persistence, or pace." AR 22. In other words, the conclusions overlap though they differ slightly. The ALJ offered reasons justifying the difference that are clear and convincing. The ALJ stated his skepticism of Dr. Young's conclusion that Plaintiff's ability to maintain concentration was moderately to severely impaired in light of Dr. Young's concurrent observation that Plaintiff exhibited adequate attention and concentration during the mental status examination. If Plaintiff could maintain adequate attention and concentration throughout the exam, it raises the question why Plaintiff would have a moderate to severe impairment to maintain concentration, persistence, and pace in performing simple repetitive tasks. This discrepancy is not explained in Dr. Young's evaluation. Nor does any observation in Dr. Young's report directly support the designated range of Plaintiff's limitation. Further, Plaintiff's apparent

1     assertion to Dr. Young that he had suffered auditory hallucinations for a year appears to be either a

2     fabrication or a misinterpretation. [5] Plaintiff's explanation for Dr. Young's notation of auditory

3     hallucinations is that Dr. Young "equated Plaintiff's description of nightmares and flashbacks (which

4     were translated through an interpreter during the psychological examination) with auditory

5     hallucinations." (Dkt. No. 19 at 19 n.7.) Given Plaintiff's admission that he in fact had not

6     experienced auditory hallucinations for a year but Dr. Young believed he had, it is undisputed that Dr.

7     Young's assessment was based on incorrect information. Even absent a negative credibility finding,

8     the ALJ was correct to not give full weight to an opinion that was based on a false belief of severe

9     mental trauma. In other words, the ALJ's rejection or discounting of Dr. Young's opinion was based

10     on the clear and convincing reason that her report, at least in part, was tainted by the false belief that

11     Plaintiff experienced auditory hallucinations for a year. The ALJ's proffered reasons are clear and

12     convincing to the extent the ALJ simply lowered the range of Plaintiff's impairment from moderate-

13     to-severe to mild-to-moderate.

14          Plaintiff's only argument specific to the adequacy of Dr. Young's report is that the report was

15     based on objective clinical testing and observation, not solely Plaintiff's self-reports. While the Court

16     does not disagree, Plaintiff's assertion is unresponsive to the discrepancy identified by the ALJ and

17     the admittedly incorrect finding that Plaintiff experienced auditory hallucinations for a year.

18     **3.     Dr. Miller**

19          Dr. Miller was contracted in late 2006 by Dr. Afray to "clarify [Plaintiff's] diagnoses and

20     attempt to answer the question of whether he is suffering from [PTSD] and/or Major Depression."

21     AR 375. Dr. Miller met with Plaintiff twice, and, based on self-assessment exams and his own

22     observations, concluded that Plaintiff is "clearly suffering from [PTSD] and Major Depression." AR

23     381. The ALJ appeared to deem Dr. Miller's opinion "not reliable" because the opinion was premised

24     on Plaintiff's embellishments and inconsistent self-reports. AR 25. The ALJ, however, also appears

25     to have accepted Dr. Miller's conclusion that Plaintiff has a "fair ability to maintain concentration and

26     attendance." AR 21; *see also* AR 379 ("Evaluation of cognitive processes indicated that the client's

27

28     ───────────────
[5] Dr. Young noted that Plaintiff reported hallucinating hearing yelling and shouting, someone telling him to "call for help," and someone knocking on the door when no one is there. AR 207.

attention and concentration skills were moderately impaired.").  Although Dr. Miller makes an evaluation of Plaintiff's cognitive abilities (poor to average), Dr. Miller does not appear to identify any other specific limitation beyond his ability to concentrate.  In short, the ALJ's rejection of Dr. Miller's opinion appears to be limited to his PTSD and Major Depression diagnoses, which was the purpose of his report; the ALJ accepted Dr. Miller's reported limitation of Plaintiff's ability to concentrate and attend.

Thus, even if it was error to reject Dr. Miller's diagnoses based on a negative credibility finding, such error was harmless because, as discussed above, the ALJ either considered Plaintiff's PTSD and Major Depression as severe or considered the diagnoses beyond step two.  *See, e.g.*, AR 21 ("Although the claimant has been diagnosed with depression and post-traumatic stress disorder (PTSD), the evidence before me does not describe that degree of functional limitation necessary to establish a Listing level mental impairment."); *see also Blair-Bain v. Astrue*, 356 Fed. Appx. 85, 88 (9th Cir. 2009) (unpublished) ("[E]ven if it were error to reject Dr. Deodhar's diagnosis of fibromyalgia, the error was harmless, because it was 'inconsequential to the ultimate disability determination.'  The ALJ did find that Blair–Bain had severe fibromyalgia, and Dr. Deodhar did not identify specific limitations associated with Blair–Bain's fibromyalgia." (quoting *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (citation omitted)).

## C.     The ALJ's Credibility Determination

The ALJ's negative credibility determination does not appear to be based on any specific testimony Plaintiff gave at either of the hearings, which only briefly included a discussion of Plaintiff's symptoms (nightmares, sometimes being frightened when out by himself, etc.).  Rather, the determination appears directed towards 1) Plaintiff's general allegations that he has "an inability to perform all work due to his pain and other symptoms," AR 26, and 2) Plaintiff's self-reports to the treating and examining physicians.  Regarding the latter point, the ALJ's credibility determination is relevant only for the purpose of assessing whether the ALJ's reason for rejecting or discounting a doctor's opinion is clear and convincing.  That assessment has already been made above.  Thus, the only question that remains is whether the ALJ's determination that Plaintiff's general allegation that

1    he is unable to perform all work due to his pain is less than credible is supported by clear and

2    convincing reasons. The Court concludes that it is.

3          If the claimant has presented objective medical evidence of an underlying impairment which

4    could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence

5    of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if

6    she gives "specific, clear and convincing reasons" for the rejection. *See Vasquez v. Astrue*, 572 F.3d

7    586, 591 (9th Cir. 2009). An ALJ's findings concerning credibility must be "grounded in evidence"

8    and articulated with "sufficient[ ] specific[ity] [so as] to make clear to the individual and to any

9    subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for

10   that weight." SSR 96–7p, 1996 WL 374186 (July 2, 1996). In making such a determination, the ALJ

11   may consider at least the following: claimant's reputation for truthfulness, inconsistencies in

12   claimant's testimony, claimant's daily activities, work record, and testimony from physicians and

13   third parties concerning the nature, severity, and effect of the symptoms of which the claimant

14   complains. See *Thomas*, 278 F.3d at 958-59. The ALJ is not "required to believe every allegation of

15   disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to

16   42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Further, when

17   evaluating credibility, an ALJ may consider "the claimant's daily activities," 20 C.F.R. §§

18   404.1529(c)(3)(i),416.929(c)(3)(i); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also*

19   *Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an

20   "ALJ can rely to find a pain allegation incredible."), and work history, *see Thomas*, 278 F.3d at 959.

21         The ALJ gave five reasons for discounting Plaintiff's credibility: 1) Plaintiff's poor work

22   history; 2) Plaintiff's daily activities; 3) symptom embellishment; 4) Plaintiff's statements about

23   driving to Dr. Young; and 5) Plaintiff's statements about the number of cars he owns.

24         Regarding work history, the ALJ noted that Plaintiff, despite claiming a disability onset date

25   of only 2004, has not worked since arriving in the United States in 1989. A finding that a claimant

26   has an "extremely poor work history" and "has shown little propensity to work in her lifetime,"

27   negatively affects the claimant's credibility regarding her inability to work. *Thomas*, 278 F.3d at 959.

28   Here, Plaintiff was in the United States for 15 years before alleging that he had a debilitating

condition that prevented him from working, yet at no time in those 15 years did Plaintiff ever work. Plaintiff argues that his "lack of work history in the United States is not at all inconsistent with his limited education, limited English proficiency, his experience of having lived through the Khmer Rouge's genocide in Cambodia, and his resulting PTSD." (Dkt. No. 23 at 8.) The Court is not persuaded. Many immigrants with limited educations and English proficiency have come to the United States and sought out work, even immigrants coming from countries where they have witnessed grave atrocities. Thus, it was at least rational for the ALJ to view Plaintiff's nonexistent work history as negatively affecting his credibility and must be upheld even if the evidence could afford an inference more favorable to Plaintiff. *See Burch v. Barnhart,* 400 F.3d 676, 680 (9th Cir.2005); *see also Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record").

Plaintiff's activity of driving his children to and from school on a daily basis also undermines his assertion that he is totally unable to work. Even if Plaintiff is not required to drive his children far, Plaintiff's admittedly uncompromised ability to maintain a *daily* schedule and routine of dropping his kids off and picking them up at school is in conflict with his assertion that he is incapacitated from working due to his PTSD and depression. The Court accordingly finds the ALJ's observation clear and convincing. The ALJ's observation that Plaintiff is able to clean his backyard, however, is not a clear and convincing reason to discount Plaintiff's credibility as to his mental disability. Unlike a twice-daily routine of transporting his children, Plaintiff's report of cleaning the backyard is vague and is something Plaintiff states he engages in "sometime[s]." AR 87. Nonetheless, the error is harmless since the ALJ gave other clear and convincing reasons for discounting Plaintiff's credibility as to his total inability to work. *See Carmickle*, 533 F.3d at 1162.

The ALJ also reasoned that Plaintiff was less than credible because he falsely told Dr. Young in 2005 that he had been experiencing auditory hallucinations for one year. AR 24, 27. As discussed above, Plaintiff acknowledges that this statement is incorrect, but denies that he actually said it. The ALJ, however, was reasonable in concluding that the statement—which was never given before or again—was false and negatively affected Plaintiff's reputation for truthfulness. Again, although the

evidence also could afford an inference more favorable to Plaintiff, the ALJ's interpretation of the evidence was rational, and his conclusion clear and convincing; thus, it must be upheld. *See Burch*, 400 F.3d at 680.

The Court, however, is not so convinced that Plaintiff's recounting of specific details of his traumatic experiences is inconsistent with Plaintiff's assertion that his memory is compromised. *See* AR 27. While it may at first appear that a person with a compromised memory would be unable to recount a past experience in detail, that conclusion ignores that Plaintiff's PTSD diagnosis entails vivid recollections of his past traumatic experiences *as well as* a compromised memory in other respects. Thus, the contradiction the ALJ identified simply states Plaintiff's PTSD symptoms, and the Court accordingly does not find it to be a clear and convincing reason to discredit Plaintiff's credibility. Nonetheless, the error is harmless since the ALJ gave other clear and convincing reasons for discounting Plaintiff's credibility as to his total inability to work. *See Carmickle*, 533 F.3d at 1162.

The ALJ identified other inconsistencies in the record that do support discounting Plaintiff's credibility. Specifically, although Plaintiff told Dr. Young in 2005 that he did not drive because "he fears he will have difficulty related to his heart," AR 206, Plaintiff told Dr. Pon the next day that "[h]e does drive," AR 210. Although this inconsistency could be explained by a mistake by Plaintiff's interpreter, the ALJ was reasonable in viewing the inconsistency as a mark against Plaintiff's credibility, particularly in light of the other valid reasons for discounting Plaintiff's credibility discussed above. Inconsistent statements as to Plaintiff's driving habits is a clear and convincing reason to discount Plaintiff's reputation for truthfulness, which negatively affects his allegation that he is totally unable to work.

Finally, the ALJ discredited Plaintiff on the basis of inconsistent statements regarding the number of cars he owned. AR 27. In Plaintiff's December 2004 benefits application, he reported owning only one car, a 1985 Toyota pickup truck. However, the ALJ noted that there was "considerable evidence in the record suggesting that he had an ownership interest in more than one vehicle at the time that he filed his application for benefits." AR 27. The ALJ observed that there were declarations by Plaintiff's nephew and daughter, each indicating that Plaintiff had served as co-

1  signatory to the purchase of a 2000 Toyota and a 1996 Honda, the two additional cars Plaintiff

2  technically "owned." AR 28. The ALJ further noted that Plaintiff "has represented himself as

3  simultaneously owning several vehicles and thereby obtained advantageous insurance rates for family

4  members while, in other instances, he has denied that he owned more than one vehicle and thereby

5  apparently has sought to avoid the impact of the rules pertaining to [SSI] resource limits." *Id.* The

6  ALJ concluded: "[t]he claimant's conflicting statements regarding his ownership of various motor

7  vehicles and his transfer of ownership of title to the 2000 Toyota shortly after the Cooperative

8  Disability Investigations Unit's report was issued substantially undermine his credibility." *Id.*

9  Plaintiff's explanation for this inconsistency is that the question must have been misinterpreted to

10  him; he asserts that he was "not asked how many cars he owned or how many cars his name was on

11  the title for, but whether and what car he drove." (Dkt. No. 19 at 21.) The ALJ, however, was not

12  required to accept Plaintiff's explanation for the inconsistency. It may well be that the question of car

13  ownership was not properly translated to Plaintiff, but the ALJ's interpretation of the evidence was

14  reasonable. Thus, while Plaintiff's statement regarding car ownership alone would likely be

15  insufficient to discredit Plaintiff's credibility, Plaintiff's statements, in combination with the other

16  valid reasons discussed above, provide an additional clear and convincing reason to discount his

17  reputation for truthfulness and thus his allegation that he cannot work.

18  **D.    The ALJ's Residual Functional Capacity Determination**

19      At step four in the analysis, the ALJ must determine the claimant's RFC, *i.e.*, what the

20  claimant is capable of doing despite his or her mental and physical limitations. 20 C.F.R. § 416.945.

21  The ALJ must base this finding on all of the relevant medical and other evidence in the record. *Id.*

22  The VE will then use this RFC determination to assess which jobs in the national economy the

23  Plaintiff is capable of fulfilling. In order for the testimony of a VE to be considered reliable, the

24  hypothetical posed must include "all of the claimant's functional limitations, both physical and

25  mental" supported by the record. *Thomas*, 278 F.3d at 956 (citations and internal quotation marks

26  omitted).

27      The RFC the ALJ provided the VE at the first hearing, which is the VE he relied on in his

28  opinion, was a medium exertional RFC with no public contact and an inability to communicate in

English. AR 29, 573-574. The ALJ concluded based on the VE's testimony that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence in the record and relies on the ALJ's errors discussed above; namely, the ALJ's omission of PTSD and Major Depression as severe limitations, the rejection or reduction in weight of some of his treating and examining doctors' opinions, as well as the negative credibility finding. Due to these omissions, Plaintiff argues, the RFC did not reflect all of Plaintiff's limitations. As discussed in detail above, the Court disagrees that these were errors. Thus, to the extent Plaintiff's argument regarding the RFC relies on his contentions that the Court has already rejected, Plaintiff's challenge to the RFC necessarily fails.

Beyond Plaintiff's re-hashing of his previous arguments, Plaintiff baldy asserts that the RFC determination was not based on substantial evidence. Plaintiff's conclusory assertion fails to identify which specific limitations the ALJ's RFC allegedly failed to include. Plaintiff cannot simply declare that the RFC is inadequate without specifically identifying why it is so. Because Plaintiff fails to explain why the ALJ's RFC is lacking or is inconsistent with the accepted opinions of Plaintiff's examining and treating doctors, the Court rejects Plaintiff's conclusory assertion that the RFC is not supported by substantial evidence.

Finally, Plaintiff appears to argue that the RFC is deficient because the ALJ relied on Dr. Pon, an orthopedic examiner, in formulating the RFC. Plaintiff's argument ignores that he has previously sought to base his disability on physical as well as mental impairments. Thus, when the ALJ stated that his RFC was influenced by Dr. Pon's opinion, the ALJ is simply, and correctly, incorporating medical opinion related to Plaintiff's alleged physical impairments. There is nothing to suggest that the ALJ used Dr. Pon's opinion, which does not include any mental health diagnoses, as a source, let alone the only source, for determining Plaintiff's limitations due to his mental impairments.

# CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED. Judgment will be entered in Defendant's favor and against Plaintiff.

IT IS SO ORDERED.

Dated: December 30, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE